UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DARWIN YARLS, JR. ET AL

VERSUS

DERWYN BUNTON ET AL

CIVIL ACTION

NO. 16-31-JJB-RLB

## RULING

Over the past six months, this Court has expressed various concerns with this case, concerns over justiciability, federalism, and whether the Court has the authority to fix a state system, that, according to all parties to this dispute, is broken.[1] The concerns that this Court has with the case touch upon fundamental issues about the nature of its judicial power and, even more fundamentally, about its role in relation to state criminal courts. Ultimately, and after reviewing all of the briefing in this case, this Court finds that it is required to dismiss the case on comity and federalism grounds.

## I.    BACKGROUND

The Plaintiffs originally filed this class action lawsuit on January 14, 2016.[2] They sought to represent a class of Orleans Parish arrestees who had been placed on a waiting list by Defendants Derwyn Bunton, the head of the Orleans Public Defenders ("OPD"), and James Dixon, the Louisiana State Public Defender who is tasked with administering Louisiana's public defense system. In their initial complaint, Plaintiffs merely requested declaratory relief that their placement on a waiting list violated their Sixth and Fourteenth Amendment rights to counsel and their Fourteenth Amendment right to equal protection.[3] Later, Plaintiffs amended their complaint to ask

---

[1] Order, Doc 34; Order, Doc. 53.
[2] Complaint, Doc. 1.
[3] *Id.* at 15-16.

for injunctive relief as well.[4] Additionally, the parties quickly submitted, for the Court's approval, a Joint Motion for Final Declaratory and Partial Injunctive Relief.[5] This Motion included a Proposed Opinion and Order.[6]

This Court was asked to sign the Proposed Opinion which included a final declaratory judgment establishing that proposed class members' constitutional rights were violated and interim injunctive relief, primarily in the form of reporting by both Defendants on the status of waiting lists in Orleans Parish. The Proposed Order also pronounced that this Court would "retain jurisdiction to monitor and enforce compliance with this judgment and other ancillary matters that arise."[7] According to the Proposed Opinion, abstention would not be warranted in this case under *Younger v. Harris*.[8]

During a telephone conference on June 16, 2016, the Court explained its concerns relative to the joint submission and ordered the parties to submit supplemental memoranda addressing the following issues: "(1) the means available for this Court to provide an adequate remedy to redress the alleged constitutional violations and the Court's authority to provide such relief; (2) the proper order of proceedings…(3) the plaintiffs' standing for injunctive relief (particularly redressability)…and (4) identifying other cases addressing the same issues in Orleans Parish."[9] The Court had two main concerns in asking for this briefing. First, the Court was concerned with

---

[4] Am. Compl. 14, Doc. 27.

[5] Doc. 29.

[6] *Id.* at 6.

[7] *Id.* at Proposed Opinion 6, Doc. 29.

[8] The Younger section of the Proposed Opinion stated: "The Court finds that abstention is not warranted under *Younger*…As a practical matter, Plaintiffs' prosecutions were effectively stayed by the state's failure to provide them with an attorney, since the State cannot conduct any critical stages of the prosecution in the absence of defense counsel…A declaratory judgment therefore does not risk interference with an ongoing criminal proceeding…If anything, a declaratory judgment would facilitate the trial…Abstention is also unwarranted because declaratory relief is not directed at the fact of Plaintiffs' prosecutions, nor could it be raised as an affirmative defense in those prosecutions." *Id.* at 2 (internal citations omitted). The Court disagrees with this proposed finding, and, for the reasons stated below, it finds that it must refrain from hearing this case based on *Younger*.

[9] Order, Doc. 31.

whether it would be acting beyond the bounds of its Article III power in entertaining a dispute that was not a typical case or controversy, but rather, an attempt to remedy the undisputed inadequacies of a state funding system. Second, it was concerned with the myriad comity issues that would result were this Court to issue injunctive relief against members of the state judiciary and public defender offices or the public defender board.

Notably, only the Plaintiffs responded to the Court.[10] The Plaintiffs submitted a supplemental memorandum that provided a multi-step proposal that the Court would follow in this case.[11] Plaintiffs noted that one Defendant had a few disagreements with the proposed relief, but neither Defendant submitted his own memorandum.[12] At the time of filing, OPD had declined 150 cases and 35 individuals remained on OPD's waiting list for appointed counsel.[13] That memorandum also noted that the Orleans criminal bench had removed individuals from the waiting list either by appointing cases to OPD – over OPD's objections that it could not provide ethical representation given its huge workload – or by appointing private counsel even though there is no separate funding source to cover the costs of appointed private counsel.[14] Additionally, the memorandum proposed a five-step process for the Court to exercise its remedial authority.

The Court issued another Order on July 14, 2016 terminating the Joint Motion for Final Declaratory and Partial Injunctive Relief. In this Order, the Court again noted that it had concerns

---

[10] As discussed more fully below, the Court has had a difficult time discerning the extent of its remedial authority having received little to no input from Defendants on the issues. The parties are aligned in seeking a judicial declaration from this Court in an apparent attempt to place pressure on the Louisiana legislature to increase funds for public defense services. While the parties' interests are laudable, the parties ask this Court to take on a role that it is not allowed to play. The legislature is the proper entity to resolve this funding crisis.

[11] *Supp. Mem.* Doc. 33.

[12] *Id.* at 1 ("Plaintiffs' counsel consulted with opposing counsel for both Defendants prior to filing this supplemental memorandum. Counsel for Defendant Dixon do not consent to Steps 3-5, outlined in [this memo]. Otherwise, Defendants have no objections to Plaintiffs' memo.").

[13] Currently, there are 84 defendants on the waitlist, 29 of whom are incarcerated. *Def.s' Jurisdictional Memo.* 2, Doc. 57.

[14] *Id.* at 3.

about "the relief requested, the parties necessary to effectuate such relief, the order of proceedings suggested by the Plaintiffs, and federalism."[15] Due to its concerns over federalism, the Court encouraged the parties to seek "whatever relief they can in the courts handling the criminal cases involved or other avenues of relief they may have."[16]

At the request of the Court, the Plaintiffs filed a Second Amended Complaint. After reviewing the Second Amended Complaint, the Court asked for further briefing from the parties. Given that both parties appeared to agree that Defendants' actions were in violation of the Constitution, the Court asked the parties to address justiciability issues and it repeated that it still had federalism concerns.[17] The Court noted that if its concerns were not satisfied by the briefing, it would dismiss the case.

## II.   DISCUSSION

Unfortunately, the Court's concerns have not been satisfied by the parties. Unlike most cases, here, there is no disagreement as to liability.[18] The only issues for the Court to decide are remedial in nature. The Court has had a difficult time discerning the extent of its remedial authority in this case because the parties are not concretely adverse. The Supreme Court has recently noted that even when Article III permits the exercise of federal jurisdiction, prudential considerations demand that a federal court insist upon that "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."[19] Here, the parties are not directly opposed and so, at every turn, the Court has had to

---

[15] Order, Doc. 34.
[16] *Id.*
[17] Notice and Order, Doc. 53.
[18] *Pl.s' Jurisdictional Memo.* 6, Doc. 56 ("[W]hile Defendants agree with class members' assertions that waiting lists are unconstitutional, Defendants have not given that agreement any legal effect by providing class members with competent counsel."); *Def.s' Jurisdictional Memo.* 5, Doc. 57 ("Mr. Bunton agrees that under the law the putative class members deserve counsel and that it is his role to provide that counsel. However, it is his position…that providing counsel to prospective clients on the waitlist would violate numerous ethical concepts.").
[19] *United States v. Windsor*, 133 S.Ct. 2675, 2687 (2013) (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

question the nature of its own power without the aid of the illumination that "concrete adverseness" brings.

This Court does not have the remedial tools to resolve the funding crisis. By all objective measures, there is a crisis in public defense funding in Louisiana.[20] However, this does not mean that this federal district court, in a *civil* section 1983 class action, is the correct forum to remedy this serious systemic problem. At this point in time, it is a problem to be resolved by the State legislature. To the extent the federal judiciary has a role to play in passing judgment on the quality of representation by state public defenders, it must address those issues in post-conviction proceedings. Otherwise the judiciary would be interfering with state criminal proceedings and run afoul of the balance struck between federal and state courts.[21] Any declaratory judgment or injunction entered by this Court would inevitably lead it to become the overseer of the Orleans Parish criminal court system, a result explicitly condemned by the United States Supreme Court in *Younger* and *O'Shea*.[22]

While the Court prefers to discuss its reasons for dismissing this case under the umbrella of *Younger* abstention, it alternatively finds that this is a non-justiciable case under Article III. "Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so."[23] "There is no reason to demand a final expression in terms of standing, ripeness, mootness, or political question doctrine, if the court is able to conclude that there is no

---

[20] Joint Proposed Opinion 1-2, Doc. 29 ("[T]here is no dispute that the state legislature has chronically underfunded Louisiana's public defender system. The system relies overwhelmingly on a $45 fee assessed on those convicted of a crime. In practice, approximately two-thirds of public defense funding comes from fees collected on traffic tickets. This system is inherently unreliable and inadequate. It renders public defender funding dependent on factors entirely divorced from the actual demand for public defenders, such as the number of highways that pass through a district…Plaintiffs' Sixth Amendment right to counsel has been violated.").

[21] As will be discussed later, the Fifth Circuit has cautioned federal district courts not to issue relief that would amount to "an ongoing federal audit of state criminal proceedings…" *Gardner v. Luckey*, 500 F.2d 712, 715 (5th Cir. 1974).

[22] *Younger v. Harris*, 401 U.S. 37 (1971); *O'Shea v. Littleton*, 414 U.S. 488 (1974).

[23] *Renne v. Geary*, 501 U.S. 312, 316 (1991).

sufficient need for deciding the issues tendered without relying on the frequent question begging terminology of any single concept."[24] Although the Court could express its reasons for dismissing this case in terms of standing (especially the redressability prong), the prohibition against advisory opinions, or ripeness, the *Younger* doctrine provides a clearer framework for this Court to discuss those same concerns.

### A.    Federalism and Comity Concerns

This Court has repeatedly expressed its federalism concerns and, although Plaintiffs' goals are laudable, the Court is unable to surmount the difficult federalism obstacles that any grant of relief in this case would necessarily entail. Both the Fifth Circuit and Eleventh Circuit have focused on *Younger* abstention as the primary reason as to why a federal court must decline this kind of case.[25]

"In general, the *Younger* doctrine *requires* that federal courts decline to exercise jurisdiction over lawsuits when three conditions are met: (1) the federal proceeding would interfere with an ongoing state judicial proceeding; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has an adequate opportunity in the state proceedings to raise constitutional challenges."[26] Abstaining from interference in state criminal proceedings preserves the "vital consideration" of comity between the federal and state courts.[27] The Supreme Court explained *Younger* abstention in this way:

> The concept does not mean blind deference to 'State's Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and

---

[24] *Ciudadanos Unidos De San Juan v. Hidalgo Cnty. Grand Jury Com'rs*, 622 F.2d 807, 815 n. 17 (5th Cir. 1980) (internal quotation marks and citation omitted).
[25] *Gardner v. Luckey*, 500 F.2d 712 (5th Cir. 1974); *Luckey v. Miller*, 976 F.2d 673 (11th Cir. 1992) ("*Luckey V*").
[26] *Bice v. Louisiana Public Def. Board*, 677 F.3d 712, 716 (5th Cir. 2012) (emphasis added and citations omitted).
[27] *Luckey V*, 976 F.2d at 676.

6

federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the states.[28]

Federal courts may not entertain actions that seek to impose "an ongoing federal audit of state criminal proceedings."[29] In *Gardner v. Luckey*, the plaintiffs were three Florida residents who had been separately convicted of crimes.[30] They brought a class action under Section 1983 against their state public defender offices, seeking declaratory and injunctive relief.[31] "The thrust of their complaint was that the Public Defender Officers systematically failed to meet minimum constitutional standards in the representation afforded indigents" at both their trial and appellate stages.[32] The plaintiffs did not seek release nor did they seek damages. Instead, they asked the district court to issue a declaratory judgment that the Public Defenders' acts and practices violated their rights.[33] They also requested an injunction that would enjoin the Public Defenders from further representing indigents unless certain minimum standards were met.[34] The case was dismissed by the district court for various reasons.[35] The Fifth Circuit affirmed the dismissal, but noted that it was affirming the dismissal on other grounds—namely because of *Younger* abstention: "[T]o the extent the complaint alleged present and continuing constitutional deprivations due to the representation appellants were receiving in pending state appeals proceedings, *Younger*…barred the suit."[36] The Court also noted that *Younger* barred it from issuing any type of relief because any attempt by the federal court to enforce its injunction against the public defenders

---

[28] *Younger*, 401 U.S. at 44.
[29] *O'Shea*, 414 U.S. at 500; *Gardner*, 500 F.2d at 715 ("This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of [interference] that *Younger v. Harris* and related cases sought to prevent. It is clear from the face of their complaint that our appellants contemplate exactly the sort of intrusive and unworkable supervision of state judicial processes condemned in *O'Shea*.") (citations omitted).
[30] *Id.* at 713.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* at 714.
[36] *Id.*

in individual cases would act as "an ongoing audit of state criminal proceedings" which the court was prohibited from doing.[37] The Fifth Circuit indicated that the proper avenue for plaintiffs to challenge their public defense was via habeas corpus: "[W]e hold that appellants cannot get into federal court to make their sweeping challenge to the operation of the Florida Public Defender Offices. We emphasize, however, that they are not left without a remedy for constitutional wrongs, if any, done them by the Offices. They can challenge the legality of their custody via federal habeas corpus, subject, of course to prior exhaustion of state remedies."[38]

Even seemingly limited remedies present comity problems if enforcing these remedies would require a federal court to intermeddle in state criminal prosecutions.[39] In *Luckey v. Miller* ("*Luckey V*"), the Eleventh Circuit affirmed a district court decision to dismiss a class action indigent defense case on abstention grounds.[40] Prior to its decision in *Luckey V*, the Eleventh Circuit had upheld the plaintiffs' complaint in the face of both 12(b)(6) and Eleventh Amendment challenges. Plaintiffs' complaint asserted a class action on behalf of all individuals who are or in the future would be adversely affected by the unconstitutional practices of the Georgia public defender system.[41] The defendants in the case were the Georgia governor and "all Georgia judges responsible for providing assistance of counsel to indigents criminally accused in Georgia courts."[42] Plaintiffs argued that the public defender system was so inadequate that it violated their

---

[37] *Id.* at 715.

[38] *Id.*

[39] *Luckey V*, 976 F.2d at 679; *see also E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1125 (9th Cir. 2011) (citing *Luckey V*, 976 F.2d at 679). In *E.T. v. Cantil-Sakauye*, the plaintiffs were foster children who brought a putative class action against state and county judicial officials, alleging that the caseloads of the county dependency court and court-appointed attorneys were so excessive as to violate federal law. The district court granted a motion to dismiss, finding that it was required to abstain. The Ninth Circuit affirmed. The court declined the plaintiffs' "invitation to consider in isolation their (now-narrowed) request for relief, as though reaching the merits of their declaratory judgment claims would end the matter. For 'even the limited decree' sought here 'would inevitably set up the precise basis for future intervention condemned in *O'Shea*.'"

[40] *Luckey V*, 976 F.2d at 674.

[41] *Id.* at 676.

[42] *Luckey v. Harris*, 860 F.2d 1012, 1013 (11th Cir. 1988) ("*Luckey I*").

Sixth, Eighth, and Fourteenth Amendment rights. The plaintiffs sought either declaratory relief (a judgment by the court that the state actors must use their best efforts to bring the public defense system in line with the US Constitution) or injunctive relief (various court orders which would require the defendants to provide adequate counsel).[43]

The court held that "[l]aying the groundwork for a future request for more detailed relief which would violate the comity principles expressed in *Younger* and *O'Shea* is the precise exercise forbidden by the abstention doctrine."[44] In other words, the court said, even at the motion to dismiss stage, it was not supposed to view the case in a vacuum. The plaintiffs argued, as they do in this case, that the court had a host of remedies available that would not offend comity principles. As an example, they said that a "declaratory judgment could be imposed and the state defendants left to their own resources in formulating a means for compliance."[45] They also argued that "a simple 'best efforts' decree would leave the defendants similar autonomy in fashioning their means of compliance."[46] The court ultimately found that even these limited remedies presented comity problems. At the motion to dismiss stage, the court held that it was required to question the "potential enforcement difficulties" that would arise if the defendants did not comply with the court's orders. The court held that "hypothesized recalcitrance" was the precise inquiry required by the court: "This Court is constrained, therefore, to focus on the likely result of an attempt to enforce an order of the nature sought here. It would certainly create an awkward moment if, at the end of protracted litigation, a compliance problem arose which would force abstention on the same ground that existed prior to trial."[47]

---

[43] *Luckey V*, 976 F.2d at 676, 678.
[44] *Id.* at 679.
[45] *Id.* at 678.
[46] *Id.* at 679.
[47] *Id.*

9

While the Plaintiffs in this case assert that the relief they request will not raise federalism concerns, this Court disagrees. Like the *Luckey V* court, this Court must address the potential enforcement difficulties that would follow were it to issue even the seemingly limited relief sought by Plaintiffs. At various points throughout this litigation, the Plaintiffs have told the Court that it should not worry about potential enforcement difficulties until later in this litigation.[48] Based on *O'Shea* and *Luckey*, this Court disagrees. It must address the potential enforcement difficulties now.

Plaintiffs have clearly requested relief which would inevitably cause this Court to violate comity and federalism principles. Here, the Plaintiffs have requested various forms of relief. In their most recent complaint, they ask for four different declarations of law and three types of injunctive relief.[49] The Plaintiffs have characterized their requested relief in this way: "They seek an order from the federal court recognizing that waiting lists are unconstitutional and ordering Defendants to develop and implement a plan to provide them with competent counsel."[50]

On its face, an injunction that requires the Defendants to "implement a plan" to provide the class with competent counsel may seem innocuous enough, but, what would happen if the Defendants failed to implement the plan? Would this Court have to order attorneys for certain indigents?  To what extent would this Court be encroaching upon the role of the state judges in

---

[48] *Pl.s' Jurisdictional Memo.* 2, Doc. 56 ("Irrespective of what form of equitable relief this Court enters, it has the right to expect that the state of Louisiana will honor the Court's orders, and the authority to ensure that it does. The possibility of noncompliance by the State and its officials cannot justify denying Plaintiffs jurisdiction to obtain critical relief under the [US] Constitution."); *Id.* at 16, 19 ("[S]tate officials may not claim good faith or lack of funding as defenses to a court order for injunctive relief...Defendants must instead demonstrate that compliance with the federal order is impossible. This is a difficult standard to satisfy, and one that Defendants would have the burden to establish. However, **these are questions the Court should not reach until the remedial phase of this litigation, if it reaches them at all**. There is no evidence in the record to suggest that the State of Louisiana – acting, as it must, through its executive officials, the judiciary, and the legislature – will prove unequal to the task of ending waiting lists if this Court issues Plaintiffs' requested declaratory and injunctive relief....**[A]gain, these are issues for another day**.") (emphasis added).
[49] Second Am. Compl. 16, Doc. 43.
[50] *Pl.s' Jurisdictional Memo.* 8, Doc. 56.

individual prosecutions? What would happen if inconsistent orders were issued? What if the Defendants were nominally complying with the order by assigning counsel to indigents but those attorneys were not "competent?" Would the Court have to make a "competence" determination pretrial? Would a class member be able to enforce the injunction and find that counsel was ineffective at the pretrial stage thereby circumventing the post-conviction habeas process? What if Defendants still refused to comply? Would this Court order the state courts to release the incarcerated members who were still on the waitlist? The Court declines to issue injunctive relief because it will inevitably lead this Court to engage in an ongoing audit of the criminal cases in Orleans Parish.

Likewise, the Court refuses to issue declaratory relief that will be ineffective. In order to surmount the federalism problems, the Plaintiffs have suggested that the Court should "consider the propriety of issuing a final declaratory judgment – as opposed to a declaratory order – without entering injunctive relief."[51] However, any declaratory judgment issued would be an advisory opinion with no real impact. Further, Defendants cannot dispute that waitlists violate the constitution, but they use them in an attempt to comply with ethical duties that require them to limit their caseloads.[52] By issuing a declaratory judgment, the Court would just be repeating what those involved already know—Defendants are not living up to their duties.

The Court's holding that it is required to abstain from hearing this case is further bolstered by the fact that neither the Supreme Court nor the Fifth Circuit have recognized a pretrial ineffective assistance of counsel claim. Such claims have not been recognized by many federal

---

[51] *Pl.s' Jurisdictional Memo*. 18, Doc. 56.

[52] *See id.* at 6. ("[W]hile Defendants agree with class members' assertions that waiting lists are unconstitutional, Defendants have not given that agreement any legal effect by providing class members with competent counsel."); *Def.s' Jurisdictional Memo* 5, Doc. 57 ("Mr. Bunton agrees that under the law the putative class members deserve counsel and that it is his role to provide that counsel. However, it is his position…that providing counsel to prospective clients on the waitlist would violate numerous ethical concepts.").

CRITICAL

circuits because doing so would require federal district courts to oversee and interfere in pending state criminal cases. However, state courts in Pennsylvania, New York, and Michigan have all held that pretrial ineffective assistance claims are cognizable.[53] In those state court decisions, abstention issues obviously had no relevance. The Michigan appellate court noted that while it could hear these pretrial claims, a federal court would not be able to because doing so would require it to review and interrupt ongoing state proceedings and "intermeddl[e] in state prosecutions."[54] This Court likewise sees no way to enter this funding fray without intermeddling in state criminal prosecutions potentially causing inconsistent relief.

## III.   CONCLUSION

It is clear that the Louisiana legislature is failing miserably at upholding its obligations under *Gideon*.[55] Budget shortages are no excuse to violate the United States Constitution. The legislature must resolve the crisis and locate a stable source of funding. As Judge Arthur Hunter, a criminal district court judge in Orleans Parish, recently observed in ordering incarcerated defendants on the waitlist to be released:

> The defendants' constitutional rights are not contingent upon budget demands, waiting lists, and the failure of the legislature to adequately fund indigent defense…We are now faced with a fundamental question, not only in New Orleans, but across Louisiana: What kind of criminal justice system do we want? One based on fairness or injustice, equality or prejudice, efficiency or chaos, right or wrong?[56]

---

[53] *Kuren v. Luzerne Cnty.*, 146 A.3d 715 (Pa. 2016); *Hurrell-Harring v. NY*, 930 N.E.2d 217 (N.Y. 2010); *Duncan v. Michigan*, 774 N.W.2d 89 (Mich. Ct. App. 2009), *aff'd* 866 N.W.2d 407 (Mich. 2010). A federal court recently described these three cases in the following manner: "Each of the cases cited was brought as a class action suit on behalf of indigent criminal defendants. They have presented the question of whether, based on specific allegations, a particular indigent defense program has been chronically underfunded and understaffed to the point that the public defenders have been unable to provide constitutionally adequate representation…In each of these cases, the court[s] allowed the claims to proceed, finding the facts asserted were compelling and sufficient to withstand motions to dismiss." *Cox v. Utah*, Civil Action No. 16-53, 2016 WL 6905414, at *3 (D. Utah Nov. 7, 2016).

[54] *Duncan*, 774 N.W.2d at 129 n. 18.

[55] *See generally* Bill Quigley, No Lawyers? No Jail. Judge Demands Constitution Be Respected in Louisiana Public Defender Catastrophe, Huffington Post, Apr. 9, 2016; Tina Peng, I'm a Public Defender. It's Impossible For Me To Do A Good Job Representing My Clients, Washington Post, Sept. 3, 2015; John Burkhart, The Crisis in Public Defense Funding: The Approaching Storm & What Must Be Done, 62 Louisiana Bar Journal 360, Winter 2015.

[56] *State v. Bernard*, No. 528-021 (La. Crim Dist. Ct. Parish of Orleans April 8, 2016).

This Court has faith that the state court criminal judges will do their best to uphold the constitutional rights of the defendants on the waitlist. But the judges can only offer temporary relief in this crisis. Lasting relief will only come when the legislature locates an adequate source of funding for public defense offices.

For the reasons stated above, this case will be dismissed as a matter of federalism and comity.

Signed in Baton Rouge, Louisiana, on January 31, 2017.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**